UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 1:13-cv-1112-TWP-DKL |
| | ) | |
| BULLSEYE AUTOMOTIVE PRODUCT INC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

*Report and Recommendation*
*Regarding Motion to Reconsider Denial of Plaintiff's Motion to Hold Defendants in Contempt*
[doc. 120]

Plaintiff's *Motion to Reconsider Order Denying Plaintiff's Motion to Hold Defendants in Contempt* is before the Court, having been referred by the Honorable Tanya Walton Pratt, District Judge. The Magistrate Judge's contempt authority is set forth in 28 U.S.C. § 636(e). Since the parties have not consented to the Magistrate Judge's jurisdiction, the undersigned makes a report and recommendation certifying the following facts to the District Judge who has the authority to punish contempt. *See id.* § 636(e)(6)(B)(iii).

*Findings of Fact*

1. On October 31, 2014, this Court entered its *Default Judgment for Permanent Injunction Against Bullseye Automotive Products Inc. and Bullseye Lubricants Inc.* [doc. 99] (the "*Injunction*").

2. Pursuant to the *Injunction*, Defendants ("Bullseye") were permanently enjoined from using in any form or manner the APO Starburst, the name and mark American

Petroleum Institute, the name and mark API, and any confusingly similar marks or names, including the Counterfeit Starburst and the Second Counterfeit Starburst depicted in the *Injunction*, and also were ordered, *inter alia*, to:

(a) Issue, by no later than November 3, 2014, corrective advertising and publish in one major newspaper of general circulation in Chicago, Illinois, in one major newspaper of general circulation in Detroit, Michigan, and in one major newspaper of general circulation in Indianapolis, Indiana, as well as in the trade publications titled *Lubes and Greases Magazine*, *NACS Magazine*, and *ILMA Compounding Magazine*, the Notice set forth in the *Injunction*;

(b) Send the Notice directly to all distributors who have purchased Bullseye products bearing the complained-of labels and refund the distributors the full purchase price for all products bearing the complained-of labels that the distributors return to Bullseye; and

(c) File with the Court, no later than November 10, 2014, a verified certification of compliance with the *Injunction*.

[*Default J. for Permanent Inj.*, doc. 99 at 2-4.]

3.  Also on October 31, 2014, the Court entered a *Judgment for Damages Against Bullseye Automotive Products Inc. and Bullseye Lubricants Inc.* [doc. 100], ordering Bullseye to pay damages to American Petroleum Institute ("API") in the amount of $1,827,674 with post-judgment interest to accrue at the highest rate permitted by law until paid in full.

4.  On November 3, 2014, API's counsel sent a letter by FedEx to Bullseye's President, Carlos Silva, summarizing and enclosing a copy of the *Injunction*, which

was delivered to Silva's residence on November 5, 2014; a copy of the letter and its attachments were emailed to Silva on November 11, 2014. [*See B. Brett Heavner Declaration*, doc. 104-1, ¶ 2.] The physical address and email address API's counsel used were the same addresses that Silva provided during his deposition on January 10, 2014. [*Id.*, doc. 104-1, ¶ 4 & Ex. C.]

5. Bullseye failed to comply with the *Injunction* by:

(a) Failing to publish the Notice in one major newspaper of general circulation in Chicago, Illinois, in one major newspaper of general circulation in Detroit, Michigan, and in one major newspaper of general circulation in Indianapolis, Indiana, as well as in the trade publications titled *Lubes and Greases Magazine*, *NACS Magazine* and *ILMA Compounding Magazine* [*see Decl. of Emily Florio,* doc. 104-2, ¶¶ 3-11]; and

(b) Failing to file with this Court a verified certification of their compliance with the *Injunction*, which was due by November 10, 2014.

6. Bullseye also failed to comply with other provisions of the *Injunction*, as shown by the following:

(a) On November 17, 2014, a week after Bullseye was required to file the verified certification, Bullseye engine oil bearing a label with the complained-of infringing imitation of the API Starburst mark was being offered for sale on the Wholesale Motor Oil website, [www.vkwholesale.com/motor-oil-12-pk.htm](www.vkwholesale.com/motor-oil-12-pk.htm) [*Heavner Decl.*, doc. 104-1, ¶ 6 & Exs. D-E.]

(b) The image of the infringing Bullseye label remained on the website as of December 26, 2014.  [*Id.*]

(c) And on January 28, 2015, an internet search located at least one distributor of automotive products, Premier International, Inc. of Eastlake, Ohio (www.dollarstoredist.com), whose website displayed a photograph of Bullseye's motor oil bearing the infringed trademark at the following URL: http://dollarstoredist.com/popup_image.php?pID=18319. [*Id.*, ¶ 7 & Ex. F.]

7. On April 21, 2015, API filed a *Verified Motion for Proceedings Supplemental* [doc. 103] and *Plaintiff's Motion to Hold Defendants in Contempt* [doc. 104], requesting that the Court hold Bullseye in civil contempt for violating the *Injunction*, and enter coercive sanctions to induce Bullseye's compliance with the *Injunction* in the future and remedial sanctions to compensate API for Bullseye's non-compliance, including an award to API of its reasonable attorney fees and costs.

8. On May 26, 2015, the undersigned held an evidentiary hearing on both motions at which Silva presented sworn testimony that:

(a) Bullseye was officially dissolved in August 2014, before the *Injunction* was entered;

(b) Bullseye paid him less than $28,000 in 2014;

(c) After its dissolution, Bullseye had no assets, inventory, or funds left to pay for publishing corrective advertising, sending notices to its distributors, making refunds for returned products, or otherwise doing the things that Bullseye was ordered to do pursuant to the *Injunction*; and

(d) Silva did receive a copy of the *Injunction*, but when he received it, Bullseye had no funds left to do the things the *Injunction* ordered Bullseye to do.

9. In support of the testimony that Bullseye had no funds to pay for publishing corrective advertising, etc., defense counsel Peter Limperis gave API's counsel prior to the hearing copies of Bullseye's 2013 and 2014 corporate tax returns; counsel also argued that because Bullseye had been dissolved before the *Injunction* was entered and because Bullseye had no funds to pay for corrective advertising, etc., it should not be held in contempt of court for not complying with the *Injunction*.

10. "In light of the testimony given," the Court denied the contempt motion. [*Entry from Proceedings Supplemental Hrg.*, doc. 116 at 1.]

11. API subsequently filed a *Renewed Verified Motion for Proceedings Supplemental* [doc. 118] and *Motion to Reconsider Order Denying Plaintiff's Motion to Hold Defendants in Contempt* [doc. 120].

12. After several continuances, on February 22, 2016, the Court held a combined hearing on the motions. [*See* doc. 148.] Plaintiff advised the Court that it would not pursue proceedings supplemental at that time and presented testimony in support of its *Motion to Reconsider*. Silva presented sworn testimony.

13. The Illinois Secretary of State's website shows that Bullseye was not dissolved until April 10, 2015. [*See 2/22/16 Mot. Hrg., Ex. 1, Carlos Silva Dep. 1/18/16, Ex. 1*; *see also* doc. 120-1.]

14. Furthermore, API has presented evidence that Silva's testimony that Bullseye had no funds to pay for publishing corrective advertising, etc. was false.

(a) A copy of Bullseye's 2013 tax return, attached to the *Motion to Reconsider* as

*Exhibit B*, reflects that in 2013 Bullseye had gross receipts or sales of $370,882 and a

taxable income of -$777.  [*See* doc. 120-2 at 2.]

(b)   The Affidavit of W. Todd Schoettelkotte, API's damages expert, reflects

that Bullseye's sales of the accused engine oil products for January through September

2013 was actually $615,921.  [*Schoettelkotte Aff.*, doc. 93-1 at 2, ¶ 4 & 5, ¶ 8.]

(c)   Thus, it appears that Bullseye failed to report more than $245,000 in sales

on its 2013 federal tax return.

(d)   The affidavit also reflects that Bullseye's gross profits on the accused sales

through September 2013 were $106,554 and that Bullseye's total gross profits on

accused sales from 2010 through September 2013 were $466,226.  [*Id.* at 8, ¶ 14.]

(e)   Thus, it seems that Bullseye would have had funds available to pay for

publishing corrective advertising, etc., as required by the *Injunction*.

15.  The bank statements for Bullseye's bank accounts at JPMorgan Chase Bank

("Chase") that API put into evidence as Exhibit 1 at the February 22, 2016

hearing show that the tax returns provided to API's counsel before the May 26, 2015

hearing substantially understated Bullseye's actual revenues.

(a)   In 2013, the deposits into Bullseye's bank account made by customers

who paid by wire transfer (many customers paid by check) totaled $827,000—more

than twice the $370,882 in gross sales shown on the 2013 tax return.  [*Silva Dep.* at 62.]

(b)  At his deposition, Silva was shown the pages of the bank statements

reflecting deposits made into Bullseye's Chase account during 2014 and was asked

to highlight any deposits that did *not* represent sales proceeds.  [*Silva Dep.* at

6

65-67.] The deposits that Silva did *not* highlight—meaning they represented sales proceeds—totaled over $327,000 [*id.* at 67-68 & Ex. 7], which was substantially greater than the gross sales reflected on Bullseye's 2014 tax return.

16. According to Bullseye's bank statements, the cash that Silva took out of the company in 2014 in transfers to his personal bank account, cash withdrawals, and ATM withdrawals exceeded $51,000. [*Silva Dep., Exs. 28, 29, 30, & 31.*]

17. Furthermore, the bank statements and cancelled checks establish that from 2011 through September 2014, Silva paid himself hundreds of thousands of dollars out of Bullseye by taking cash withdrawals from, and paying his personal expenses out of, Bullseye's bank account. The cash that he took out of Bullseye at that time totaled over $207,000. [*Silva Dep., Exs. 28, 29, 30, & 31.*]

18. The Chase bank statements and cancelled checks also reflect that Silva used Bullseye's bank accounts to pay thousands of dollars of his own personal expenses, including, but not limited to:

- Car loans;
- Purchases of luxury cars, including a late model Mercedes Benz R320 and a late model Mercedes Benz SL550;
- A condominium association fee;
- Medical and dental bills;
- Travel expenses for Silva, his wife, and daughter;
- Day care bills;
- Bills to repair and store a speedboat allegedly owned by a friend of Silva's and not owned by Bullseye;
- The tabs at fancy bars, restaurants, nightclubs, and a gentlemen's club;

[*Silva Dep., Exs. 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, & 32.*]

19. Silva claimed that he used the Bullseye checking account as his personal

checking account because he considered Bullseye's payment of his personal expenses to be part of his compensation. [*Silva Dep.* at 90.]

20.  He also claimed that some of the personal expenses he paid out of Bullseye's bank account were actually business expenses, or personal expenses for which he received Form 1099s and reported as income on his personal tax returns. [*Id.* at 86-87.]

21.  However, Silva's 2013 and 2014 personal tax returns reflect that the amount on his 1099 forms and reported on his tax returns was $28,330 for 2013 and $21,750 for 2014. [*2/22/2016 Hrg.*, *Pl.'s Exs. 3, 4, 5, & 6.*]

22.  Moreover, Bullseye's tax returns discredit Silva's claim that the expenses he paid at bars, restaurants, nightclubs, and a gentlemen's club using Bullseye's debit card were business expenses.

(a)  In July 2013, for example, Silva spent more than $2,000 using Bullseye's debit card at a gentlemen's club. [*Silva Dep.*, *Ex. 32.*]

(b)  In August 2013, he spent more than $6,700 using Bullseye's debit card at bars, restaurants, and nightclubs. [*Id.*]

(c)  Bullseye's 2013 tax return reflects a business deduction for "Meals and Entertainment (50%)" for the entire year of 2013 of only $1,129. [*Id.*, *Ex. 2.*]

23.  The bank statements from Chase included the monthly bank statement for a second bank account that Silva opened for Bullseye on September 3, 2014 [*Silva Dep.* 190 & *Ex. 33*]—five days after API filed *Plaintiff's Verified Motion for Entry of*

*Default Against Bullseye*—with over $22,000 in funds he transferred from Bullseye's other bank account. [*Id.* at 190-91.]

24. And during that month, an additional $27,000+ were deposited into this second account, bringing the total deposited to over $50,000. [*Id., Ex. 33.*]

25. Although Silva used approximately $28,000 from this second account to pay Bullseye's creditors, he also withdrew more than $21,000 in cash—including a final withdrawal on September 25, 2014—bringing the ending account balance to $0. [*Id.*]

26. If Silva had not taken cash out of Bullseye's account and had not used Bullseye's funds to pay his personal expenses, Bullseye would have had funds to pay for publishing the corrective advertising, etc. required by the *Injunction*.

27. The Illinois Secretary of State records show that Orion Lubricants, Inc., d/b/a as Titan Lubricants, was incorporated in March 2014 by agent Peter Limperis of Burbank, Illinois [*see Mot. for Extension of Time, Ex. A*, doc. 164-1; *see also Pl.'s Submission of Additional Suppl. Evid., Ex. A*, doc. 168-1]—counsel for Defendants.

28. At that time, *Plaintiff's Motion for Preliminary Injunction* [doc. 20] was pending against Bullseye and Silva (then a named Defendant) and set for a hearing. The motion asked the Court to, *inter alia*, order Bullseye and Silva to cease manufacturing, bottling, selling, or otherwise distributing engine oils with labeling that is infringing, false and misleading, or otherwise dangerous to consumers, and to cease producing, at least temporarily, any engine oils until it has been shown that the engine oils can be accurately labeled as safe for use in automobiles that are currently on the nation's roads. [*Id.* at 1.]

29.  On April 10, 2014, the Court entered a *Preliminary Injunction Order* enjoining Bullseye and anyone acting on its behalf, including its officers, agents, etc. as requested in the *Motion for Preliminary Injunction*.  [*See* doc. 72.]

30.  The bank statements for the two bank accounts that Orion Lubricants had at Chase (the "Orion Bank Accounts") show that:

(a)  The  Orion Bank  Accounts were opened in October 2014.  [*Pl.'s Submission Add'tl Suppl. Evid.*, Exs. *C, C-2, and D*, docs. 168-3 thru -5.]

(b)  Silva's name does not appear on the Orion Bank Accounts bank statements, but  the signatures on the checks drawn on the account appear to match the signatures on checks drawn on Silva's bank account. [*Compare, e.g.,* ORION00077, doc. 168-3 at 77 *with Pl.'s Submission Add'tl Suppl. Evid., Ex. F*, doc. 168-7.]

(c)  Checks  were  written  on  the  Orion  Bank  Accounts  to  many  of  the  same companies that had formerly received checks drawn on the Bullseye Bank Accounts, including  Labels  Unlimited,  Champion  Packaging,  and  Midwest  Express.   [*Pl.'s Submission Add'tl Suppl. Evid.*, Exs. *C, C-2, and D*, docs. 168-3 thru -5.]

(d)  Several of the cash deposits to the Orion Bank Accounts were made at the same address—9540 S. Roberts Rd., Hickory Hills, Illinois—as the ATM from which Silva made several cash withdrawals from the Bullseye Bank Accounts.  [*Id.*]

(e)  From October 2014 through July 2016 (the date of the last bank statements produced), at least $800,000 were deposited into the Orion Bank Accounts.  [*Id.*]

31.  Thus, it appears that Silva may have had Orion Lubricants formed in order to continue selling motor oil and to continue making profits from such sales, and he deposited sales proceeds into the Orion Bank Account.

32.  The Petroleum Quality Institute of America apparently issued a consumer alert for motor oil distributed by Orion Lubricants Inc. which oil was purchased in February 2016.  [*See Pl.'s Submission of Additional Supplemental Evidence, Ex. A*, doc. 168-1.]

33.  Pursuant to Plaintiff's motion, on April 26, 2016, the Court ordered Silva to deliver to API's counsel by May 2, 2016, original signed Requests for Transcripts of Tax Returns ("Request Forms"), requesting the IRS to send API's counsel copies of Bullseye's and Silva's tax returns for several years.  [*See* doc. 154.]  Silva did not comply with the order.  Thus, on May 25, 2016, the Court ordered Silva to show cause, if any, by June 7, 2016, why he should not be held in contempt of Court for failure to comply with the Court's order.  Thereafter, API's counsel received signed originals of the Request Forms. Nonetheless, to date, Silva has failed to show why he should not be held in contempt.

*Conclusions of Law*

1.  The district court has discretion to enter a finding of civil contempt.  *Bailey v. Roob*, 567 F.3d 930, 933 (7th Cir. 2009).

2.  To prevail on a request for a finding of contempt, a movant must establish "by clear and convincing evidence that (a) the district court's order set forth an unambiguous command; (b) [the alleged contemnor] violated that command; (c) the violation was significant, meaning that [the alleged contemnor] did not substantially comply with the

court order; and (d) [the alleged contemnor] failed to make reasonable and diligent effort to comply." *Ohr ex rel. NLRB v. Latino Exp., Inc.*, 776 F.3d 469, 474 (7th Cir. 2015).

3. "The district court does not … ordinarily have to find that the violation was 'willful.'" *FTC v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009) (quoting *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)).

4. Given the above findings of fact, API has established by clear and convincing evidence that (a) the *Injunction* set forth unambiguous commands, including that Bullseye cease using the infringing marks; issue a recall of all Bullseye engine oil products bearing the complained-of labels; advertise the recall in one major newspaper of general circulation in Chicago, Detroit, and Indianapolis as well as in three identified trade publications; and file with the Court by November 10, 2014, a verified certification of compliance with the *Injunction*. [*Default J. for Permanent Inj. Against Bullseye Auto. Prods. Inc. and Bullseye Lubricants Inc.*, doc. 99 at 2-4]; (b) Bullseye violated that command by offering for sale product bearing the infringing marks, continuing to use the infringing marks, failing to recall its products, advertise the recall, and file certification of compliance with the Court; (c) the violation was significant since Bullseye did not substantially comply with the *Injunction*; and (d) Bullseye failed to make a reasonable and diligent effort to comply.

5. Civil contempt includes both coercive and remedial sanctions. *Bailey*, 567 F.3d at 933. "Coercive sanctions induce a party's compliance with a court order in the future, while remedial sanctions compensate an injured party for an opponent's past non-compliance." *Id.; see also Connolly v. J.T. Ventures*, 851 F.2d 930, 932-33 (7th Cir. 1988)

(noting that the court may impose a fine payable to the injured party to compensate for losses resulting from the contumacy).

6. Remedial sanctions also may include awarding the moving party its reasonable attorney fees and costs incurred in seeking compliance with the violated order. *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005); *Bettie Page LLC v. Design Tech. Holding LLC*, No. 1:14–cv–0394–SEB–TAB, 2015 WL 1526659 at *9 (S.D. Ind. April 3, 2015).

7. "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs." *Wilson v. United States*, 221 U.S. 361, 376 (1911). Therefore, if officers of a corporation are "apprised of the writ directed to the corporation, [and] prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Id.*; *see also Domanus v. Lewicki*, 742 F.3d 290, 296-97 (7th Cir. 2014) (finding that a shareholder's "overtly noncompliant behavior in response to the magistrate's production orders certainly qualifies" as contempt); *Tranzact Techs.*, 406 F.3d at 856 ("[A]n individual officially responsible for a corporation's compliance with a court order . . . may be punished for contempt if he fails to act appropriately."); *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 784-85 (7th Cir. 1981) (concluding that a company president's failure to act to "ensure that the prior court mandates were enforced" violated the decree and amounted to civil contempt).

8. Silva was advised of the *Injunction*, and as president of Bullseye, he was responsible for Bullseye's compliance with the *Injunction*; yet he failed to take appropriate action to ensure Bullseye's compliance with the *Injunction*'s commands.

9. The undersigned finds that Bullseye should be found in contempt for violating the *Injunction*.

10. The undersigned further finds that Silva should be sanctioned for Bullseye's contempt and ordered to pay API's reasonable attorney's fees and costs incurred in connection with its *Motion to Reconsider*.

11. API argues that the Court should hold **S**ilva personally liable for the *Judgment for Damages Against Bullseye* [doc. 100], which ordered Bullseye to pay $1,827,674 in damages to API with post-judgment interest. API cites *Connolly v. J.T. Ventures*, 851 F.2d 930 (7th Cir. 1988), as authority for holding a corporate officer responsible for contempt personally liable for an underlying judgment against the corporation. But the case does not bear the weight that API puts on it. In *Connolly*, the district court found the defendant corporation and its president in contempt for violating the terms of a settlement agreement that had been incorporated into the court's order and entered a judgment against the corporation and its president. *Id.* at 931. The court awarded a judgment encompassing a compensatory award, representing the profits to defendants from the sale of the infringing product, and an attorney's fee award. *Id.* at 931-32. The award was to compensate the plaintiff for "losses sustained because of the contempt." *Id.* at 933. The court did not hold the president personally liable for damages awarded in the underlying order. *Id.* at 931-32.

12.  Rather, as the *Connolly* court recognized:

Where the responsible officers of the corporation, after notice of the decree, merely fail to take action within their power to cause the corporation to comply with the decree, the officers are in civil contempt, but the obligations of the corporation under the decree do not thereby become the personal obligations of the delinquent officers.

*Parker v. United States*, 126 F.2d 370, 379 (1st Cir. 1942), *cited in Connolly*, 851 F.2d at 934-35; *see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, Civil No. AW 12-954, 2013 WL 6844272, at *5 (D. Md. Dec. 20, 2013) (stating that "the fact that a corporate officer may be subject to the court's contempt power for failing to direct his corporations to comply with [court] orders does not mean that [the officer] can now be held personally liable for the underlying [orders] themselves") (internal quotations and citation omitted).

13.  The $1,827,674 in the *Judgment for Damages Against Bullseye* [doc. 100] was not intended to compensate API for losses resulting from Bullseye's contempt.  Rather, this amount represented Defendants' sales of the accused engine oil products between 2010 and 2013 [*see Schoettelkotte Aff.*, doc. 93-1 at 5, ¶ 8; *see also Mot. Default J. for Damages*, doc. 92, ¶ 27], that is, sales preceding the entry of the *Injunction*.

14.  While it may be appropriate to award API Bullseye's profits on engine oil product sales after the entry of the *Injunction*, API has not made a sufficient showing of what those profits may have been.  Even if an award based on Orion Lubricants's profits of oil product sales would be appropriate, and there has been no showing that the Orion Lubricants sales were of infringing products, API has not made a sufficient showing of those profits either.

15.  Nonetheless, API should be awarded some damages to compensate it for Bullseye's failure to comply with the *Injunction* for the time period between the time of the entry of the *Injunction* (October 31, 2014) and Bullseye's actual dissolution (April 10, 2015).

16.  The undersigned finds that without sufficient proof of damages to API sustained as a result of the contempt by Bullseye, an award of $50,000 to API to be paid by Silva is fair and justified.  This amount approximates the amount of cash that Silva took out of Bullseye in 2014.  It also approximates the amount that Silva deposited into the second Bullseye bank account he opened in September 2014 and then drained at the month's end, shortly before the entry of the *Injunction*.  As noted previously, Bullseye engine oil with an infringing mark was still being offered for sale in mid-November 2014, late December 2014, and at the end of January 2015.  Given Bullseye's sales for the period of 2010 to 2013, an award of $50,000 for over a five-month period appears to be conservative.

17.  Furthermore, the undersigned finds that Silva should be found in contempt of court for failing to comply with the Court's April 26, 2016 order to deliver to API's counsel the Request Forms.  Only after the Court ordered Silva to show cause why he should not be held in contempt for failing to comply with the order, did Silva provide the forms to counsel.  However, he failed to show cause, or even attempt to show cause, why he should not be held in contempt.  Therefore, Silva should be sanctioned $2,500 for this contempt to be paid to API.

16

*Recommendation*

For the foregoing reasons, the undersigned recommends that the *Motion to Reconsider Denial of Plaintiff's Motion to Hold Defendants in Contempt* [doc. 120] be granted, that *Plaintiff's Motion to Hold Defendants in Contempt* [doc. 104] be granted, and that Bullseye Automotive Products Inc. and Bullseye Lubricants Inc. be found in civil contempt for failing to comply with the *Injunction*.

The undersigned also recommends that Silva be sanctioned for Bullseye's contempt and that Silva be ordered to pay API $50,000 to compensate API for Bullseye's noncompliance.

The undersigned further recommends that API be awarded and Silva be ordered to pay API's reasonable attorney's fees and expenses incurred in connection with its *Motion to Reconsider* and that API be directed to file an affidavit for attorney's fees and expenses within 30 days of the date of the District Judge's action on this *Report and Recommendation*.

Finally, the undersigned recommends that Silva be found in civil contempt for failing to obey this Court's April 26, 2016, order and that he be sanctioned and ordered to pay API $2,500 for his contempt.

**SO RECOMMENDED**:  12/05/2016

_Denise K. LaRue_
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

## Notice Regarding Objections

Within fourteen days of being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). The district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection may result in forfeiture of the right to *de novo* determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

**The parties should not expect extensions of time to file either objections or responses. No replies will be permitted.**


Electronic Distribution to Counsel of
Record

and via Fist Class U.S. Mail to:
Peter G. Limperis
LAW OFFICES OF PETER G. LIMPERIS
5624 W. 79th Street
Burbank, IL 60459